UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIA POLOMA MORALES MELGARES, ET AL. | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 08-cv-0995 (JCH) |
| | : | |
| v. | : | CONSOLIDATED WITH |
| | : | 08-cv-1002 (JCH) |
| SIKORSKY AIRCRAFT CORPORATION, ET AL. | : | 08-cv-1014 (JCH) |
| Defendants, | : | MARCH 18, 2009 |

**RULING RE: DEFENDANTS' MOTIONS TO DISMISS (DOC. NOS. 14, 21, & 43)[1]**

**I.    INTRODUCTION**

This is a consolidated product liability action arising out of a July 2006 helicopter

crash near Tenerife, Spain that killed six persons.  The plaintiffs are the survivors and

estate representatives of two of the decedent aircrew members, the survivors and

estate representatives of two of the decedent passengers, and the helicopter's insurer

(collectively, "the plaintiffs").[2]  The defendants are the helicopter's manufacturer, the

Sikorsky Aircraft Corporation ("Sikorsky"), and its parent, the United Technologies

Corporation ("United Technologies") (collectively, "the defendants").

_____

[1] In July 2008, three cases arising from the same incident were filed against Sikorsky Aircraft Corporation and United Technologies Corporation.  Defendants originally filed a Motion to Dismiss in each of the three separate cases.  In September 2008, the three cases were consolidated.  Upon consolidation, the Motions to Dismiss were transferred to the docket of the main case, 08-cv-0995 (JCH).  Consequently, unless otherwise indicated, all docket number references in this ruling correspond to the docket of the main case.

[2] Specifically, the first of the consolidated cases, 08-cv-0995 (JCH), was filed by Maria Poloma Morales Melgares and Dorotea Zorilla Martinez as survivors and representatives of the estates of two of the decedent passengers (the "passenger plaintiffs").  The second case, 08-cv-1002 (JCH), was filed by Banco Vitalicio de Espana Cia. Anonima de Seguros y Reaseguros ("Vitalicio") as subrogee of Helicsa-Helicopteros, S.A. ("Helicsa"), the owner/operator of the crashed helicopter.  The third case, 08-cv-1014 (JCH), was filed by Maria Dolores Caballero Infante and Lorena Isidora Lopez y Munoz as survivors and representatives of the estates of two of the decedent helicopter aircrew (the "aircrew plaintiffs").

1

The plaintiffs allege the defendants violated the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m, et seq., as amended, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, et seq., ("CUTPA").  Specifically, the plaintiffs bring claims against the defendants under the theories of negligence, strict product liability, and breach of warranty for the defendants' alleged breach of duties pertaining to the design, manufacture, assembly, inspection, testing, distribution, sale, servicing, maintenance, overhaul, and repair of the helicopter and its component parts, as well as the preparation, writing, approval and/or sale of warnings, instructions, and guidance for use of the helicopter and its component systems.

The defendants have moved to dismiss all three cases on the principle of forum non conveniens and, pursuant to Fed. R. Civ. P. 12(b)(7), for the failure to join an indispensable party under Fed. R. Civ. P. 19.  For the reasons that follow, the defendants' Motions to Dismiss (Doc. Nos. 14, 21, & 43) are granted on the forum non conveniens ground.

## II.    STANDARD OF REVIEW

In deciding a motion to dismiss, the court accepts the allegations of a complaint as true and construes them in a manner favorable to the pleader.   Hoover v. Ronwin, 466 U.S. 558, 587 (1984); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  The court must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Yung v. Lee, 432 F.3d 132, 146 (2d Cir. 2005) (discussing Rule 12(b)(6) motion to dismiss); Lunney v. United States,  319 F.3d 550, 554 (2d Cir. 2003) (internal citations omitted) (discussing Rule 12(b)(1) motion to dismiss).

2

The instant Motions to Dismiss are based, inter alia, on the common law doctrine of forum non conveniens.  "The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947).  Thus, forum non conveniens is a discretionary device, which, in rare circumstances, permits a court "to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim."  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000) (internal quotation omitted).  As such, "[d]ismissal for forum non conveniens reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality."  Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422 (2007) (internal quotation omitted).  "The forum non conveniens determination is committed to the sound discretion of the trial court."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981).

## III.  BACKGROUND

### A.   Factual Overview

On the morning of July 8, 2006, a Sikorsky S-16N helicopter, registration EC-FJJ, crashed into the Atlantic Ocean off the island of Tenerife, Canary Islands, Spain. See National Transportation Safety Board ("NTSB") Accredited Representative Field Notes, dated July 18, 2006 ("NTSB Field Notes"), Exh. 1 to Affidavit of Robert J. Spragg ("Spragg Affidavit"), at 1.  The helicopter carried three crew (two pilots and a mechanic) and three passengers, all of whom were fatally injured in the crash.  See id.  The decedents included Tania Adia Martinez Zorilla, Alvaro Zapata Morales, Joaquin

3

Ignacio Ortiz de Zarate Perez-Galdos, and Antonio Ruiz y Lacasa, whose survivors and estates are plaintiffs in the instant action.

At the time of the crash, the helicopter was owned and operated by Helicsa-Helicopteros, S.A., a Spanish corporation.  See id. at 1-3.  The helicopter was insured by plaintiff Banco Vitalicio de Espana Cia. Anonima de Seguros y Reaseguros, who eventually paid out insurance proceeds totaling €3,712,418.00 as a result of the accident.  See Complaint, 08-cv-1002 (JCH), at ¶ 28.

At the time of the crash, the helicopter was under contract to the government of Spain and was being used for firefighting duties in the Canary Islands.  When the accident occurred, the helicopter was on a positioning flight from the island of La Palma to the island of Gran Canaria, so that maintenance could be performed on one of the helicopter's main rotor blades, which had started to lose nitrogen from its pressurized spar.  See id.  Accident investigators from Spain, the NTSB, and Sikorsky would eventually focus their inquiry on whether this main rotor blade failed in flight, causing the crash.  See, e.g., e-mail from Wilfred A. Alfalla of Sikorsky to William English of the NTSB, dated September 20, 2006, Exh. 2 to Spragg Affidavit, at 1.

The crash was investigated by the Spanish Civil Aviation Accident and Incident Investigation Commission, also known as the Comision de Investigacion de Accidentes e Incidentes de Aviacion Civil (the "CIAIAC").  See Spanish Interim Accident Report, Exh. A to Mem. in Supp. of Motion to Dismiss, Doc. No. 15 ("Spanish Interim Accident Report"), at 8.  The CIAIAC is the national agency responsible for the investigation of all civil aircraft accidents that take place in Spanish territory.  The NTSB participated in the crash investigation at the request of the CIAIAC, and Sikorsky participated in the

4

investigation as the NTSB's technical advisor.  <u>See</u> NTSB Field Notes at 2.

       B.    <u>The Helicopter</u>

The Sikorsky model S-61N helicopter that crashed was manufactured by

Sikorsky in Stratford, Connecticut in 1966.  <u>See</u> Sikorsky Aircraft S-61N Maintenance

Manual, SA 4045-80, Exh. 5 to Spragg Affidavit, at Introduction-1; <u>see</u> <u>also</u>, NTSB Field

Notes at 3.  The Sikorsky model S-61N is a medium-lift helicopter designed to transport

cargo and passengers over both land and water.  <u>See</u> FAA Approved Rotorcraft Flight

Manual ("FAA Rotorcraft Flight Manual"), Exh. 10 to Spragg Affidavit, at 1-1.

The helicopter's main rotor system consists of a rotor head assembly and five

main rotor blades.  <u>See</u> <u>id.</u>  Each main rotor blade is identified by a designated color, in

this case, the "yellow," "blue," "red," "black," and "white" blades.  <u>See</u> Spanish Interim

Accident Report at 6.  The blades are of the pressurized spar type, meaning that the

spar of each of the main rotor blades is hollow and is pressurized to a specific nitrogen

pressure by means of the air valve at the blade's root.  <u>See</u> <u>id.</u>  Each spar contains a

cylindrical pressure indicator on the back of the spar, whose function is to signal low

pressure.  <u>See</u> FAA Rotorcraft Flight Manual at 1-4.  Thus, if nitrogen leaks from the

spar – due to a crack or faulty seal, for example – the pressure indicator will pop out,

indicating that the pressure in the spar is below allowable service pressure.  <u>See</u> <u>id.</u>  On

a serviceable blade, the pressure indicator will not be visible.  <u>See</u> <u>id.</u>  This blade

pressure indication system is called the visual blade inspection method, also know as

the visual BIM[3] or the VBIM.  See Sikorsky Main and Tail Rotor Blade Inspection

Procedure Following BIM Indication, Exh. 11 to Spragg Affidavit, at Introduction-2.

The Sikorsky model S-61N is also equipped with a cockpit blade pressure

indication system that illuminates a visual indicator light in the cockpit if the spar

pressure in one of the main rotor blades falls below limits.  See FAA Rotorcraft Flight

Manual at 1-4.  This blade pressure indication system is called the cockpit blade

inspection method, also known as the cockpit BIM or the CBIM.  See Exh. 11 to Spragg

Affidavit, at Introduction-2.  The CBIM does not, however, indicate which main rotor

blade has lost pressure.  See FAA Rotorcraft Flight Manual at 1-4.  To determine which

blade caused the CBIM indicator, one must check the cylindrical pressure indicators of

the VBIM system.  See id.

C.     The Events Leading to the Crash

On July 6, 2006, the helicopter made a positioning flight from Jerez Airport in

mainland Spain to La Palma Airport (GCLA) in the Canary Islands.  See Spanish

Interim Accident Report at 13.  This flight involved multiple legs, including one from

Agadir (Morocco) to Las Palmas Airport (GCLP).   During the Agadir-Las Palmas leg, a

CBIM warning light illuminated in the cockpit, indicating that a main rotor blade had lost

pressure.  See id.  After landing at Las Palmas (GCLP), the crew checked the VBIM

system, which indicated that the "black" blade had low pressure.  See id.  The crew

refilled the "black" blade's nitrogen to the maintenance manual specified pressure, and

---

[3]The NTSB Field Notes use the same acronyms, but refer to BIM as the "Blade Integrity Monitor."
See NTSB Field Notes at 3.  Whether called the "Blade Integrity Monitor" or the "Blade Inspection
Method," the documents appear to refer to the same devices.

the helicopter continued to La Palma (GCLA).

On July 7, 2006, the helicopter carried out several training flights around the island of La Palma to familiarize the crew with their firefighting duties.  See id.  In the evening of July 7, 2006, at the end of the last flight of the day, a CBIM warning light again illuminated in the cockpit.  Once on the ground at La Palma Airport (GCLA), the crew verified, via the VBIM system, that the warning had again been triggered by low pressure in the "black" blade.  See id.

The mechanic in the helicopter's crew requested that replacement parts be sent from the maintenance base at Las Palmas Airport (GCLP).  See id.  Once the parts arrived, the mechanic proceeded to replace the necessary parts, but was unable to stop the pressure leak in the "black" blade.  See id.  After trying different combinations of new parts and old parts, the mechanic installed the combination that resulted in the least leakage.  See id. at 14.  Subsequently, after conferring with the maintenance base at Las Palmas Airport (CGLP), the pilots and the mechanic decided to move the helicopter to the maintenance base the next day for further testing and repairs.  See id.

At approximately 8:19 a.m. local time on July 8, 2006, the helicopter took off from La Palma Airport (CGLA) and began making its way to Las Palmas Airport (CGLP).  See id. at 8.  The helicopter's cockpit voice recorder (CVR), which was recovered from the crash site, indicates that at approximately 8:41 a.m., the pilot in command said, "see, we have a BIM PRESS," indicating that a CBIM warning light had once again illuminated in the cockpit, indicating a loss of pressure in one of the helicopter's main rotor blades.  See id. at 9.  The pilot in command received no replies to his statement about the warning light, and no further comments regarding the

7

warning light were made for the duration of the flight.  See id.  The helicopter crashed

approximately twenty-seven minutes later, at 9:08 a.m.  See id. at cover sheet, 8.

     D.    The Accident Investigation

Air traffic control at Tenerife North Airport received the first concrete report of the

helicopter's crash at approximately 10:13 a.m.  See id. at 2.  The remains of the

helicopter and some of its occupants were found shortly thereafter, and search and

rescue operations were initiated around 10:30 a.m. by the Canary Islands Search and

Rescue Services  See id. at 2-3.  Search and Rescue Services continued its operations

for seven days, and recovered the remains of all but one of the helicopter's occupants.

See id. at 3.

Between July 10 and July 20, 2006, the search for the remains of the helicopter

and the missing occupant, the co-pilot, continued, now aided by an oceanographic

vessel equipped with multibeam sonar, side-scan sonar, and surface-guided video

capable of working at depths up to 300 meters, as well as by an aircraft specially

equipped for conducting surface searches.  See id.  Together, the searches in the first

weeks following the accident resulted in the recovery of the remains of five of the six

occupants, the rear section of the helicopter's fuselage, the Cockpit Voice Recorder,

the landing gear, a section of the lower central fuselage, a cabin floor section, two radio

beacons, one life jacket, and personal effects of one of the occupants.  See id.  It was

believed that the remaining wreckage was submerged under water approximately 2300

feet deep.  See NTSB Field Notes at 1.

The Spanish CIAIAC notified the NTSB of the crash on the morning of July 8,

2006, and subsequently invited the NTSB and Sikorsky to listen to the CVR at the

laboratory of the French Bureau d'Enquetes et d'Analyses (the French organization responsible for the technical investigation of civil aviation accidents). See id. at 2. William English, NTSB's Accredited Representative, and Christopher Lowenstein, Chief of Sikorsky's Aircraft Safety Investigation Department, participated in the CVR analysis in France. See id.; see also e-mail from Christopher Lowenstein to David Gridley of General Electric, dated July 10, 2006, Exh. 17 to Spragg Affidavit. Both the NTSB and Sikorsky subsequently analyzed the recording independently. See e-mail from Anna Cushman, NTSB Aerospace Engineer, to William English, dated July 12, 2006, Exh. 19 to Spragg Affidavit. The recording was inconclusive, and the NTSB, Sikorsky, and the Spanish CIAIAC all agreed that it was necessary to recover the submerged helicopter wreckage to determine the cause of the accident. See NTSB Field Notes at 2.

From July 2006 until at least February 2008, the Spanish CIAIAC, NTSB, and Sikorsky continued to cooperatively investigate the accident. See, generally, Exhs. 21-50 to Spragg Affidavit. While the extent of Sikorsky's involvement in the investigation is in dispute,[4] the parties agree – and the record clearly indicates – that Sikorsky acted as a technical advisor to the NTSB throughout the investigation and corresponded regularly with the NTSB in that capacity. Moreover, during the investigation, when the Spanish CIAIAC acquired new evidence or information, it shared that evidence or information with the NTSB, which often forwarded it to Sikorsky. See, e.g., Exh. 29 to Spragg Affidavit (e-mail from William English of the NTSB to Christopher Lowenstein of

---

[4] Plaintiffs claim Sikorsky was "extensively involved in nearly every aspect of the investigation." See Memo. in Opposition to Motion to Dismiss, Doc. No. 35, at 7. Defendants maintain that Sikorsky had "limited involvement as a technical advisor to the CIAIAC's investigation, at the request of the NTSB, consistent with customary international practice of governmental aviation accident investigative authorities." See Reply, Doc. No. 41, at 9.

9

Sikorsky, dated September 13, 2006, sharing CIAIAC's photographs of recovered portions of the helicopter's main rotor blades). Sikorsky also conducted laboratory analyses and examinations of evidence the CIAIAC sent to the NTSB, and it participated in the examination and analysis of the "black" rotor blade at NTSB headquarters in Washington, D.C. in June 2007. See NTSB Materials Laboratory Factual Report, dated October 23, 2007, Exh. 43 to Spragg Affidavit.

      E.    <u>Results of the Accident Investigation</u>

On June 5, 2007, the Spanish CIAIAC formally issued its Interim Report on the crash. <u>See</u> Spanish Interim Report. According to the Interim Report, parts from four of the helicopter's five main rotor blades were recovered. <u>See</u> Spanish Interim Report at 6. Three of the four blade segments showed fractures of a static nature, indicating that the fractures occurred when the helicopter hit the water. <u>See id.</u> The fourth blade segment – part of the "black" blade – showed signs of a breakage that initiated in a progressive manner. <u>See id.</u> A study of the characteristics of the segment of the "black" blade, conducted at the Spanish National Institute for Aerospace Technology, concluded that the fracture of the blade started in the lower part of the spar's rear wall, propagated via a fatigue mechanism, and fully developed as the result of a static tensile overload condition. <u>See id.</u> at 10. However, the small amount of the blade's total surface area affected by the progressive fracture did not, by itself, allow for a determination of whether the fatigue process triggered the fracture of the blade, nor did it rule out the possibility that the blade fractured along the previously weakened segment upon impact. <u>See id.</u> at 11.

The Interim Report noted that the investigation was continuing "along two basic

10

lines":

> 1.  With respect to [the fracture of the "black" main rotor blade], a study of its possible influence on this accident, a determination of its origin and its connection with the history of the blade.
>
> 2.  With respect to the VBIM/CBIM system used to warn of low nitrogen pressure inside the helicopter's blade spars, a study of the procedures established by the aircraft's manufacturer and operator concerning the operation and maintenance of said system.

Id. at 14.  The Interim Report concluded by noting that the continuing investigation "has the support of the [NTSB], Sikorsky Aircraft Corporation, the helicopter manufacturer, and Helicsa, the aircraft owner and operator."  Id.

As of January 2009, the Spanish CIAIAC had not issued its final report on the crash.  See Memo. in. Opp. to Motion to Dismiss, Doc. No. 35, at 16.

## IV.   ANALYSIS

The defendants have moved to dismiss plaintiffs' suit on two grounds: (1) the doctrine of forum non conveniens, which, plaintiffs argue, requires dismissal because Spain is the more convenient forum for this action; and (2) pursuant to Fed. R. Civ. P. 12(b)(7), failure to join an indispensable party under Fed. R. Civ. P. 19, because the plaintiffs have not joined Helicsa, the helicopter's owner and operator.  The court first considers the defendants' forum non conveniens argument.

### A.    Forum Non Conveniens

While the "district courts enjoy broad discretion in applying [the doctrine of forum non conveniens, the Second Circuit,] sitting en banc in Iragorri v. United Techs. Corp., 274 F.3d 65 (2d Cir. 2001), outlined a three-step process to guide the exercise of that discretion."  Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 153 (2d Cir. 2005).

At step one, the district court determines the degree of deference properly accorded the plaintiff's choice of forum.  See id.  At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute.  See id.  Finally, at step three, the court balances the private and public interests implicated in the choice of forum.  See id.  Each step will be addressed separately.

      1.  Deference to Plaintiffs' Choice of Forum

Any review of a forum non conveniens motion starts with "a strong presumption in favor of the plaintiff's choice of forum."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981).  In fact, "it is generally understood that, unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 154 (2d Cir. 2005) (internal quotation omitted).  That said, however, courts nevertheless recognize that "the degree of deference given to a plaintiff's forum choice [can vary] with the circumstances."  Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001) (internal quotation omitted).  Typically, "the greatest deference is afforded a plaintiff's choice of its home forum, while less deference is afforded a foreign plaintiff's choice of a United States forum."  Norex Petroleum, Ltd., 416 F.3d at 154 (internal citations and quotation omitted); see also Piper, 454 U.S. at 255-256.  As the Second Circuit emphasized in Iragorri these are not "abrupt or arbitrary" rules.  Iragorri, 274 F.3d at 72.  Rather, they illustrate "a broader principle under which the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale" depending on the degree of convenience reflected by the choice in a given case.  Id. at 71.

In determining the degree of deference to which a plaintiff's forum choice is

entitled, a district court must undertake a totality review of the circumstances surrounding the plaintiff's forum selection.  See id. at 71-72.  Specifically, the court may consider relevant factors such as: (1) whether the plaintiff is a U.S. citizen; (2) convenience to the plaintiff of the chosen forum as compared to its home forum; (3) availability of witnesses in the forum; (4) defendant's amenability to suit in the forum; (5) availability of appropriate legal assistance; and (6) evidence of forum shopping to be subject to favorable law, "the habitual generosity of juries in the United States, [and] the plaintiff's popularity or the defendant's unpopularity in the region."  Iragorri, 274 F.3d at 72.  The court will consider these factors in turn.

To begin, it is important to note that all of the survivor and estate representative plaintiffs in this suit are Spanish citizens and subjects of the Kingdom of Spain.  See Complaints, 08-cv-995 (JCH), 08-cv-1014 (JCH), at 1.  Likewise, the decedents these plaintiffs represent were all Spanish citizens and subjects of the Kingdom of Spain. See id.  Vitalicio, the subrogee plaintiff, is a corporation organized under the laws of Spain with its principal place of business in Spain.  See Complaint, 08-cv-1001 (JCH), at 1.  Helicsa, the subrogor in whose shoes Vitalicio stands, is a corporation organized under the laws of Spain, with its principal place of business in Spain.  As previously noted, the fact that plaintiffs are not citizens of the United States means that, from the outset, their forum choice is entitled to less deference.  See Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 154 (2d Cir. 2005).[5]

---

[5] The passenger and aircrew plaintiffs argue that, pursuant to the United States' treaty obligations, this court must treat the plaintiffs in this case as if they were United States citizens, i.e., the court must give the plaintiffs' choice of forum greater deference.  This argument, however, is without merit.  Article VI of the Treaty on Friendship and General Relations between Spain and the United States provides that, "[t]he citizens or subjects of [Spain and the United States], shall have free access to the Courts of the

The second factor the court considers is the relative convenience of the chosen forum for the plaintiffs.  Plaintiffs claim that the District of Connecticut is a more convenient forum than Spain because, inter alia, Sikorsky designed and manufactured the helicopter at issue in this case in Connecticut, and thus the records, witnesses, and experts most relevant to the plaintiffs' product liability claims are both easily accessible in the District of Connecticut and within the compulsory power of the court.  Further, the plaintiffs point out, the defendants' records are in English, and it is likely that the majority of the witnesses and experts relevant to the plaintiffs' product liability claims do not speak Spanish.  Moreover, because of the involvement of the NTSB and Sikorsky in the Spanish CIAIAC's accident investigation, many documents and witnesses relating to that investigation are located in Connecticut and Washington, D.C., and are therefore more easily accessible in the District of Connecticut than they would be in Spain.

The court does not question these arguments.  Undoubtedly, there exist in the United States generally, and in Connecticut specifically, records and witnesses essential to the plaintiffs' suit.  That said, however, the court finds that the plaintiffs have underestimated the importance of documents and witnesses located outside the United States.

First, it is important to keep in mind that the accident at issue in this dispute took

---

other . . . ."  Treaty on Friendship and General Relations between Spain and the United States, Apr. 14, 1903, U.S.-Spain, art. 6, 31 Stat. 2105.  While the Second Circuit has, in certain circumstances, required that a foreign plaintiff be treated on terms no less favorable than those applicable to U.S. nationals due to a treaty obligation, in those circumstances the foreign plaintiff was a beneficiary of a treaty with "an explicit provision providing national access or treatment."  Pollux Holding, Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 73 (2d Cir. 2003).  In this case, the relevant Treaty between the United States and Spain does not provide for national access or treatment, but rather for "free access."  The Second Circuit has explicitly held that "'freedom of access'" cannot be taken to mean 'national access.'"  Id.  Thus, the U.S.-Spain Treaty does not afford the plaintiffs' choice of a United States forum the same deference as that afforded the choice of a U.S. citizen.

14

place in Spanish territory, involved a Spanish corporation operating a helicopter – which had been serviced and maintained in Spain – for the Spanish government, and led to the deaths of six Spanish citizens.  Further, regardless of any assistance the NTSB and Sikorsky may have provided to the Spanish investigators, the primary investigation of the accident is taking place in Spain; the Spanish CIAIAC issued the Interim Accident Report, and it will issue the final accident report.

Second, while the records and witnesses concerning the helicopter's design and manufacture are located in Connecticut, records and witnesses concerning the role design and manufacture played in the accident are located in Spain.[6]  Specifically, the sources of evidence located in Spain include, inter alia: (1) Helicsa's maintenance records; (2) the records of any third-party maintainers of the aircraft; (3) details of the helicopter's flight time and cycles; (4) evidence relating to the CBIM warning during the July 6, 2006 flight; (5) evidence relating to the CBIM warning during the July 7, 2006 flight; (6) evidence relating to the maintenance performed on the helicopter on July 6 and July 7, 2006 following the low-pressure warnings; (7) evidence relating to the decision by Helica's mechanic and maintenance base that the loss of nitrogen experienced on July 6 and July 7, 2006 was due to a leak; (8) evidence relating to the decision by Helicsa to reposition the helicopter after two CBIM warnings; (9) the recovered helicopter wreckage, including the fuselage; (10) evidence relating to an eye witness to the descent of the helicopter during the crash; (11) evidence as to the

---

[6] Plaintiffs' product liability claims rest on theories of negligence, strict product liability, and breach of warranty.  See Complaint, Doc. No. 1, at ¶¶ 25-26.  Thus, plaintiffs must prove not only injury, but that defendants' acts or omissions caused said injury.

training and performance of the helicopter pilots and crew; (12) evidence relating to the CIAIAC investigation, including its fractographic blade analysis and its conclusions regarding the role of the "black" blade in the accident.  See Affidavit of Christopher Lowenstein, Chief, Aircraft Safety Investigation at Sikorsky, Exh. D to Reply to Memo. in Opp. to Motion to Dismiss, Doc. No. 41, at 8-9.  Not only would this evidence likely have to be brought to the District of Connecticut if the case were adjudicated here, but it would also require translation into English.

Thus, while bringing suit in Connecticut affords the plaintiffs substantial convenience in the accessibility of evidence relating to Sikorsky and the involvement of Sikorsky and the NTSB in the accident investigation, it affords them substantial inconvenience in the inaccessibility of evidence relating to the primary investigation of the accident, as well as evidence relating to the events leading up to the accident and evidence of the accident itself.  Consequently, the court cannot find, at this point in the analysis, that the District of Connecticut is more convenient to the plaintiffs than their home forum.  This weighs against deference to their choice of forum.

The third factor the court considers in the first step is the availability of witnesses. As has just been discussed, relevant witnesses in this case are located both in the United States and in Spain.  While the U.S. witnesses are relatively available in the District of Connecticut – the majority appear to reside in Connecticut – the Spanish witnesses are not.[7]

---

[7] The subrogee plaintiff, Banco Vitalicio, has offered to make any witnesses under its control, or the control of its subrogor, Helicsa, available in the District of Connecticut.  While this may lessen defendants' concerns as to the availability of some of the potential Spanish witnesses, there are others – e.g., employees of the Spanish government, employees of third-party maintainers of the helicopter, and the eye witness to the crash – that would likely be unavailable if the case were adjudicated in Connecticut.

Defendants bear the burden on their motions to show that essential witnesses are unwilling to testify or provide evidence and that this court would lack the power to compel their testimony.  See Mendes Junior Int'l Co. v. Banco Do Brasil, S.A., 15 F. Supp. 2d 332 (S.D.N.Y. 1998).  They can, however, carry this burden by providing circumstantial evidence, for example, that an ongoing "'criminal investigation provid[es] a major disincentive to voluntary testimony.'"  Duha v. Agrium, Inc., 448 F.3d 867, 876 (6th Cir. 2006) (quoting First Union Nat'l Bank v. Banque Paribas, 135 F.Supp. 2d 443, 450 (S.D.N.Y. 2001)).  The defendants have offered evidence that the Spanish authorities have initiated a criminal investigation of the circumstances of the accident. See Declaration of Joaquin Garcia-Romanillos Valverde and Francisco Javier Bejar Garcia, Exh. B to Motion to Dismiss, Doc. No. 14, at 5.  The mere existence of a criminal investigation focused on the accident in this dispute would appear to be a major disincentive to voluntary testimony of the type defendants seek from witnesses in Spain (i.e., testimony regarding possible negligence in the maintenance of, and decision-making pertaining to, the helicopter in its final days).  Further, this court has no means to compel, in a manner consistent with the timely administration of justice, the testimony of Spanish citizens (including employees of the Spanish government) residing in Spain.[8]  If this dispute were litigated in Spain, however, the parties would

---

[8] While both the United States and Spain are parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, 847 U.N.T.S. 231, reproduced at 28 U.S.C. § 1781 (the "Hague Evidence Convention"), it is important to note that Spain has stated, in its declarations and reservations to Article 23 of that Convention, that is does not accept Letters of Request derived from the pre-trial discovery of documents.  See Spanish Reservations and Declarations to the Hague Evidence Convention, available online at http://www.hcch.net/index_en.php?act=status.comment&csid=558&disp=resdn.  While it is not the court's intent to suggest that, were this case tried in Connecticut, it would be impossible to obtain the testimony of any potential Spanish witnesses, it is, however, the court's understanding that obtaining the testimony of Spanish witnesses unwilling to testify voluntarily would be a difficult and time-consuming – if not altogether futile – endeavor.

likely have access to all Spanish entities, because unwilling witnesses and evidence in Spain can be compelled by the Spanish courts.  See Declaration of Joaquin Garcia-Romanillos Valverde and Francisco Javier Bejar Garcia, Exh. B to Motion to Dismiss, Doc. No. 14, at 12-13.  Thus, the court cannot conclude that witnesses relevant to this dispute are more available in the District of Connecticut than they are in the plaintiffs' home forum, which argues against deference to the plaintiffs' choice to bring suit in the District of Connecticut.

The fourth factor the court considers is the defendant's amenability to suit in the plaintiff's chosen forum.  Both Sikorsky and United Technologies have their principal places of business in Connecticut.  Clearly, they are both amenable to suit in the District of Connecticut, which argues in favor of deference to the plaintiffs' choice of forum.[9] See Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 155 (2d Cir. 2005) (plaintiff's decision to litigate where all defendants were amenable to suit is properly viewed as a strong indicator that convenience, and not tactical harassment of an adversary, informed its decision to sue outside its home forum).  Although a plaintiff's choice of a defendant's home forum does not, by itself, support a presumption of convenience, substantial deference may still be appropriate when that choice is made to obtain jurisdiction over a defendant.  See id. at 146.  But such deference is not automatically given.  See In re Air Crash near Peixoto De Azeveda, 574 F. Supp. 2d 272, 281 (E.D.N.Y. 2008).  A plaintiff's "choice of the defendant's home forum provides

_____

[9]The fact that the defendants support their forum non conveniens motions with a representation that they will submit to jurisdiction in Spain is certainly relevant at the second and third steps of the forum non conveniens analysis, but it does not alter the fact that the plaintiffs' choice of a Connecticut forum rather than their own home forum was motivated, in part, by this genuine jurisdictional convenience.  See Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 156 (2d Cir. 2005).

a much less reliable proxy for convenience," than plaintiff's choice of his own home forum.  Pollux Holding, Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 74 (2d Cir. 2003). "Accordingly, a plaintiff's choice to initiate suit in the defendant's home forum – as opposed to any other [forum] where the defendant is also amenable to suit – only merits heightened deference to the extent that the plaintiff and the case possess bona fide connections to, and conveniens factors favor, that forum."  Id.  In the present action, while the case has some connection to the United States – the plaintiffs allege that defendants, U.S. corporations, manufactured a defective product in Connecticut – the plaintiffs do not.  Further, as discussed below, the convenience factors weigh heavily in favor of the Spanish forum.  Accordingly, the court cannot conclude that the plaintiffs' choice of forum is entitled to greater deference based solely on the fact that the plaintiffs initiated the current action in the defendants' home forum.

The fifth factor the court considers is the availability of appropriate legal assistance.  Appropriate legal assistance is available in the District of Connecticut.  This weighs in favor of deference to the plaintiffs' choice of forum.

The sixth and final factor the court considers is any evidence of forum shopping to be subject to favorable law, the habitual generosity of juries in the United States, or the plaintiff's popularity or the defendant's unpopularity in the region.  Despite both defendants' and plaintiffs' explicit and implicit accusations of forum-shopping and reverse forum-shopping, the court does not find that either the plaintiffs or the

defendants were, or now are, motivated solely by improper motives.[10]

That said, however, this court is bound by the Second Circuit's instruction that, "when [a] foreign plaintiff chooses a United States forum, a plausible likelihood exists that the selection was made for forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries." Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 155 (2d Cir. 2005). Consequently, this court recognizes that the plaintiffs likely have a pecuniary interest in having this dispute adjudicated in the United States, and this interest was likely a factor in their decision to bring suit in the District of Connecticut.

As for the parties' popularity or unpopularity in the chosen forum, the record contains no evidence of the plaintiffs' popularity or the defendants' unpopularity in Connecticut.

In summation, based on a totality review of the factors discussed in this section, it is the court's opinion that the plaintiffs are entitled to some deference in their choice to bring their suits in the District of Connecticut.  While this deference is important, it is less deference than plaintiffs would have been given if they were not foreign plaintiffs. See Overseas Media, Inc. v. Skvortsov, 277 Fed. Appx. 92, 97 (2d Cir. 2008) ("There was no abuse of discretion in the district court's conclusion that plaintiffs' choice of

---

[10] As one court in this circuit so aptly noted, "[i]n applying the Iragorri factors, [a district court] cannot be blind to the practical realities of cross-border litigation. The often pejorative connotation inherent in the label 'forum shopping' is generally undeserved. It is a fact that plaintiffs will almost always select a forum in which they believe they will maximize their recovery, as long as they have a reasonable chance of remaining in that forum, and that forum is often within the U.S.  Conversely, defendants will generally seek to relegate actions to the forum in which they believe their exposure is minimized, and that forum is often outside of the U.S.  Assuming the requirements of Federal Rule of Civil Procedure 11 are met . . . there is nothing immoral or unsavory about plaintiffs making such choices or defendants seeking to undo them." In re Air Crash near Peixoto De Azeveda, 574 F. Supp. 2d 272, 279 (E.D.N.Y. 2008)

forum was entitled to some deference, but less deference than if they were not foreign plaintiffs"). Yet, even where the degree of deference is reduced, an "action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." Iragorri, 274 F.3d at 74-75. With this in mind, and with the scales recalibrated to account for reduced deference to the plaintiffs' choice of forum, the court turns to the second and third steps of the forum non conveniens analysis. See Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 157 (2d Cir. 2005) (the court's determination of the level of deference to accord a plaintiff's choice of forum "recalibrate[s] the balance for purposes of the remaining analysis").

      2.  Adequacy of the Alternative Forum

"To secure dismissal of an action on grounds of forum non conveniens, a movant must demonstrate the availability of an adequate alternative forum." Norex Petroleum, Ltd. v. Access Indus., 416 F.3d 146, 157 (2d Cir. 2005). "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." Pollux Holding, Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003).

Both of these conditions are satisfied. First, the defendants agree to submit to jurisdiction in Spain as a condition of dismissal. See Mem. in Supp. of Motion to Dismiss, Doc. No. 14, at 12-13 ("[T]he defendants stipulate to jurisdiction before the appropriate Court of First Instance in Spain"). Second, none of the plaintiffs argue, and there is nothing in the record to suggest, that Spain does not permit litigation of the subject matter of these disputes. In fact, the passenger and aircrew plaintiffs explicitly concede that "the courts of the Kingdom of Spain and Spain's legal system represent a

'suitable' alternate forum within the meaning of the <u>forum</u> <u>non</u> <u>conveniens</u> doctrine." Mem. in Opp. to Motion to Dismiss, Doc. No. 35, at 2.  Consequently, under the second step of the <u>forum</u> <u>non</u> <u>conveniens</u> analysis, the court concludes that Spain is an adequate alternative forum for the plaintiffs' suits.

3.  Private and Public Factors

In the third and final stage of the <u>forum</u> <u>non</u> <u>conveniens</u> calculus, courts consider a number of private and public factors that influence the relative convenience of the fora in question. <u>See</u> <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947).  Private interests to the litigants include:

> (1) The relative ease of access to sources of proof; (2) availability of compulsory process [to compel] attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) the possibility of [a] view of premises, if [a] view would be appropriate to the action; (4) the enforcibility of a judgment if one is obtained; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive.

<u>BFI Group Divino Corp. v. JSC Russian Aluminum</u>, 2008 U.S. App. LEXIS 23220, 13-14 (2d Cir. Nov. 4, 2008) (citing <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501 (1947)).  The public interests the court considers include:

> (1) Administrative difficulties inherent in bringing a case in a congested docket; (2) imposing jury duty on citizens who have no relation to the litigation; (3) holding the trial in the view and reach of the citizens whom the trial might affect; (4) local interest in having localized controversies decided at home; and (5) avoiding requiring that a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

<u>Id.</u>

a.  Private Factors

In weighing the relative ease of access to sources of proof in this dispute, as well as the availability of compulsory processes to compel attendance of unwilling, and the

22

cost of obtaining attendance of willing, witnesses, the court begins by noting that the defendants have offered, as a condition of dismissal, to make all relevant evidence and witnesses under their control available to the plaintiffs in Spain.  See Motion to Dismiss, Doc. No. 14, at 12-13.  The court also notes that the defendants have already produced thousands of pages related to the S-61N main rotor blades, the BIM systems, and the helicopter's instructions, manuals, and warnings, and further that these documents were produced on a compact disc which can be transported to Spain quite easily.  See Affidavit of Garret J. Fitzpatrick, Exh. 1 to Reply, Doc. No. 41, at ¶¶ 4, 7; see also Reply, Doc. No. 41, at 7.   Because the plaintiffs primarily seek evidence and witnesses concerning Sikorsky's design and manufacture of the helicopter and its component parts, the court finds that this adequately addresses platinffs' concerns that evidence in the United States would not be available in Spain.

Further, because part of the defendants' theory of the case is that negligence on the part of Helicsa and the helicopter's other maintainers is the actual and proximate cause of the accident, the evidence and witnesses in Spain are essential to this litigation.  For the reasons previously discussed, much this evidence is, in effect, unavailable to the defendants if this action is adjudicated in the United States.[11]  See section IV.A.1, supra at 14-18.  This weighs heavily in favor of adjudication in Spain.

Regarding the possibility of a view of premises, while it is unlikely that a view of

---

[11] As noted previously, the fact that Vitalicio has offered to make available in Connecticut any evidence and employees under its control or Helica's control addresses one essential subset of evidence located in Spain.  It does not, however, address a second essential subset, namely, the evidence and witnesses outside Vitalicio/Helicsa's control.  This second subset includes evidence and witnesses in the control of the Spanish government, evidence and witnesses in control of third-party maintainers of the helicopter, and independent witnesses such as retired employees or the eye witness to the crash.

the crash site will be necessary in adjudicating this products liability action, it may be necessary for the tier of fact to view the wreckage of the helicopter, which is located in Spain.  This weighs in favor of adjudication in Spain.

The court also considers the enforcibility of a judgment if one is obtained. Because the defendants have agreed, as a condition of dismissal, to pay any final, post-appeal judgment awarded against them by a Spanish court, the District of Connecticut is no more convenient than Spain in this regard.  See Motion to Dismiss, Doc. No. 14, at 13.  This factor is neutral.

Finally, regarding the practical problems in this dispute, the court finds that these considerations weigh in favor of adjudicating this case in Spain.  Most importantly, Helicsa and other third party maintainers of the helicopter are not subject to personal jurisdiction in this forum, and therefore defendants will be unable to join these entities in defending the suit if the action remains here.

In contrast, the defendants have unequivocally consented to jurisdiction in Spain. This difference in jurisdiction over potentially liable entities weighs strongly in favor of dismissal.  See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) (holding that dismissal was proper because it would be unfair to make the defendants proceed to trial in the U.S. when witnesses were beyond the reach of the compulsory process, and defendants would be unable to implead potential foreign third-party defendants); Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1002 (2d Cir. 1993) (noting that litigation in the U.S. without all of the interested parties "creates a risk of inconsistent judgments"); Crosstown Songs U.K. Ltd. v. Spirit Music Group, Inc., 513 F.Supp. 2d 13, 17 (S.D.N.Y. 2007) (holding that, "[i]t would be unfair to require defendant to litigate

24

here without the opportunity to bring in parties and witnesses who are critical to its

setoff defense").

In addition, the court finds the plaintiffs' concerns that litigation in Spain would

lead to greater time and expense to be unwarranted.  Plaintiffs claim that adjudication in

Spain would mean "protracted litigation," but provide no evidence for this conclusion.

See Mem. in Opp. to Motion to Dismiss, Doc. No. 33, at 21.  The defendants, on the

other hand, contend that, in total, the expected time to reach trial in Spain is in the

range of six to nine months from the day a lawsuit is filed, and support this claim with

the declaration of Francisco Javier Bejar Garcia, a Senior Judge in Spain and an expert

on civil and criminal liability in that country.  See Supplemental Declaration of Francisco

Javier Bejar Garcia, Exh. E to Reply, Doc. No. 41, at 3.  Consequently, the court credits

the defendants' argument, and finds that the potential time until adjudication in Spain is

no more than, and likely shorter than, the time for adjudication in the District of

Connecticut.

In weighing the practical problems of the two fora, the court considers the

relative costs of litigating this suit in Spain and the United States.  None of the parties

have offered any evidence or argument concerning the costs of counsel.  They focus

instead on costs related to the translation and transportation of evidence.  However, as

the court has previously noted, the defendants have produced thousands of pages of

documents on a compact disc, which can be transported quite easily.  Transportation of

the evidence in Spain, on the other hand, which may include the helicopter's wreckage,

would likely be costly and time consuming.  Further, because this dispute involves

essential evidence and witnesses in both Spain and the United States, a number of

documents will have to be translated regardless of the forum.  Given that the court has found the indispensable evidence to be evenly distributed between the two fora, the expense of translation is essentially neutral.  As a result, the cost factor argues in favor of adjudicating this dispute in Spain.

In sum, all of the private interest factors the court considered are either neutral or weigh in favor of resolving the dispute in Spain.

          b.  Public Factors

Concerning the administrative difficulties of this case, the party's arguments focus on the administrative difficulties of dealing with translations, as well as the burden and costs associated with a complicated, highly technical, and likely lengthy trial.

As the court has already noted, regardless of the forum, the court that eventually adjudicates this case will be dealing with documents in translation.  The parties, not the court, will provide these translations.  Thus, the administrative difficulties pertaining to translations are essentially equivalent in both fora.

The same analysis holds true for other administrative costs of trying this case. The parties have not provided any evidence that would support a finding that the administrative cost of trying this case would be significantly greater in either of the proposed fora.  Thus, the court considers the administrative difficulties factor neutral.

As for the next public interest factor, none of the parties present any arguments specifically addressing the imposition of jury duty on citizens who have no relation to

the litigation, and therefore the court skips this factor.[12]

The court next considers the public interest factors of holding the trial in the view and reach of the citizens whom the trial might affect, and the local interest in having localized controversies decided at home.  Plaintiffs argue that Connecticut has the greater interest in seeing this dispute resolved locally because, inter alia, defendants are two of the most prominent, well-established companies in the state; the suits arise from tortious activity which allegedly occurred in Connecticut; and a variant of the Sikorsky model S-61 is still used today to transport the President of the United States, among others.[13]  See Mem. in Opp. to Motion to Dismiss, Doc. No. 33, at 28.  The defendants, on the other hand, contend that Spain has a significant and compelling local interest in having this litigation result not only in full and fair compensation to the families of its citizens who died in the crash, but also of having all parties who are potentially at fault participate in the suit and be held accountable.  The court agrees.

As has been noted throughout this ruling, at the time of the crash, Helicsa, a Spanish corporation, was operating the helicopter at issue in this suit under a contract with the Spanish government.  The crash took place in Spain, and all decedents were Spanish citizens.  Spain, and not Connecticut or the United States, is handling the primary investigation of the accident.  Spain, and not Connecticut or the United States,

---

[12]Given the court's holding that Spain has the more significant interest in having this suit adjudicated locally, see infra, 27-28, were the court to analyze the jury duty factor, it would likely find that imposition of jury duty on the citizens of Connecticut is unduly burdensome in this case because their general interest in the safety of products manufactured in Connecticut is outweighed by Spanish citizens's specific interest in ensuring that the families of the decedents are fairly compensated by those responsible for their losses.

[13]According to the plaintiffs, the United States Marine Corp. HMX-1 squadron, responsible for transporting the President of the United States, flies the Sikorsky VH-3D, which is the military version of the S-61.  See Mem. in Opp. to Motion to Dismiss, Doc. No. 33, at fn.3.

has opened a criminal investigation of the circumstances surrounding the accident.

Contrary to the plaintiffs' apparent belief, the primary purpose of this litigation is not to

determine the general safety of the Sikorsky model S-61N, but rather to determine

whether the defendants are liable for the injuries resulting from the July 8, 2006 Helicsa

crash in Tenerife, Spain.  Thus, it is the court's conclusion that Spain has the deeper

interest in holding the trial in the view and reach of its citizens, a factor that weighs

heavily in favor of dismissal.

The final public interest the court considers is the extent to which the fora can

avoid problems in conflict of laws and the application of foreign law.  To this end, the

Supreme Court has counseled that:

> The doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> . . . is designed in part to help courts
> avoid conducting complex exercises in comparative law.  As we stated in
> <u>Gilbert</u>, the public interest factors point towards dismissal where the court
> would be required to 'untangle problems in conflict of laws, and in law foreign
> to itself.' 330 U.S., at 509, 67 S. Ct. , at 843.

<u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 251 (1981).  Although "the need to apply

foreign law is not in itself a reason to apply the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u>," and

courts "must guard against an excessive reluctance to undertake the task of deciding

foreign law," the need to apply foreign law is "relevant" to the <u>forum</u> <u>non</u> <u>conveniens</u>

analysis.  <u>Manu Int'l, S.A. v. Avon Prods., Inc.</u>, 641 F.2d 62, 67-68 (2d Cir. 1981)

(internal quotation and citation omitted).

In order to determine the applicable substantive law, the court must look to the

proper choice of law rules.  In this case, however, it is not immediately clear which

choice of law rules apply.  Typically, "[a] federal court sitting in diversity applies the

choice of law rules of the forum state," in this case, Connecticut.  <u>Maryland Casualty</u>

28

Co. v Continental Casualty Co., 332 F.3d 145, 151 (2d Cir. 2003) (internal citation

omitted).  However, plaintiffs argue that the court should apply the federal admiralty

choice of law rules, because plaintiffs' state law claims are preempted by the Death on

the High Seas Act ("DOHSA"), 46 U.S.C. § 30301, et seq.  The court agrees.

Under the DOHSA, "[w]hen the death of an individual is caused by wrongful act,

neglect, or default occurring on the high seas beyond three nautical miles from the

shore of the United States, the personal representative of the decedent may bring a

civil action in admiralty against the person or vessel responsible."  46 U.S.C. § 30302.

DOHSA clearly applies in the present case because plaintiffs' decedents died on the

high seas near Tenerife, Spain, well beyond three nautical miles from the shores of the

United States.  See Jennings v. Boeing Co., 660 F. Supp. 796, 802 (E.D. Pa. 1987),

aff'd, 838 F.2d 1206 (3d Cir. 1988) (holding that DOHSA properly applies to accidents

occurring within foreign territorial waters); Offshore Logistics v. Tallentire, 477 U.S. 207,

219 (1986) (applying DOHSA to a helicopter crash on the high seas).  Further, courts

have held that the DOHSA applies "where the decedent is injured on the high seas,

even if a party's negligence is entirely land-based and begins subsequent to that injury."

Motts v. M/V Green Wave, 210 F.3d 565, 567 (5th Cir. 2000).

The DOHSA "preempts all wrongful death actions based on state law where it

applies."  Id. at 569.  Further, the Supreme Court has held that "DOHSA expresses

Congress' judgment that there should be no [survival] cause of action in cases of death

on the high seas."  Dooley v. Korean Air Lines Co., 524 U.S. 116, 123 (1998).  In so

holding, the Court explained that, "[b]y authorizing only certain surviving relatives to

recover damages, and by limiting damages to the pecuniary losses sustained by those

29

relatives, Congress provided the exclusive recovery for deaths that occur on the high seas." Id.  As a result, any recovery to which plaintiffs would be entitled based on Connecticut state law are preempted by the DOHSA.

The fact that plaintiffs invoked the court's diversity jurisdiction rather than its admiralty jurisdiction does not mean that the court is barred from exercising its admiralty powers.[14]  See, e.g., Preston v. Frantz, 11 F.3d 357, 359 (2d Cir. 1993) (instructing that, "[w]hen . . . plaintiffs bring a suit based upon diversity jurisdiction, we nevertheless apply substantive federal maritime law if we have admiralty jurisdiction"); Capozziello v. Brasileiro, 443 F.2d 1155, 1157 (2d Cir. 1971) (holding "[t]hat the district court's diversity, rather than its admiralty, has been invoked does not change the applicable [maritime] law").  Thus, the court applies the federal admiralty law choice of law analysis in determining the law applicable to this case.  See State Trading Corp. v. Assuranceforeningen Skuld, 921 F.2d 409, 414 (2d Cir. 1990) ("A federal court sitting in admiralty must apply federal choice of law rules").

In resolving conflict of laws questions in maritime tort cases, the Supreme Court has adopted an interest analysis that looks to a number of factors, including: (1) the place of the wrongful act; (2) the law of the vessel's flag; (3) the domicile of the injured

---

[14] In this case, the DOHSA expressly provides for admiralty jurisdiction because the accidental deaths occurred beyond three nautical miles from the shores of the United States.  See 46 U.S.C. § 30302.  Even without this statutory provision, however, admiralty jurisdiction is appropriately invoked here under traditional principles because "the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity."  Offshore Logistics v. Tallentire, 477 U.S. 207, 219 (1986) (holding that, "[a]lthough the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, [admiralty jurisdiction was appropriate because] that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an island . . . to the shore" (internal quotation omitted)); Preston v. Frantz, 11 F.3d 357, 358 (2d Cir. 1993) (holding that admiralty jurisdiction was appropriate in a case in which a helicopter crashed while en route from Connecticut to Nantucket Island, Massachusetts).

party; (4) the domicile of the vessel owner; (5) the place of the contract; (6) the

inaccessibility of the foreign forum; (7) the law of the forum, and (8) the vessel owner's

base of operations.[15]  See Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d 86, 90 (2d Cir.

1996) (citing Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 308 (1970); Lauritzen v.

Larsen, 345 U.S. 571, 582 (1953); Romero v. International Terminal Operating Co., 358

U.S. 354, 359 (1959)).

To begin, it is important to note that certain Lauritzen factors do not apply in this

case.  First, in contrast to Lauritzen, no direct contractual relationship exists between

the plaintiffs and the defendants in this case, so the fifth factor – the place of the

contract – is not involved in the court's analysis.  See Carbotrade S.p.A. v. Bureau

Veritas, 99 F.3d 86, 90 (2d Cir. 1996).  Further, the Second Circuit considers the

seventh Lauritzen factor – the law of the forum  – "generally of little relevance in United

States courts."  Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., 426

F.3d 580, 587 (2d Cir. 2005) (citing Carbotrade, 99 F.3d at 91 ("The seventh Lauritzen

factor - the law of the forum - is irrelevant here because this litigation is in the courts of

the United States")).  Thus, the court considers only six of the eight Lauritzen factors.

First, the place of the alleged wrongful act, i.e., the negligent design and/or

manufacture of the helicopter or its component parts, is Connecticut.  Second, the law

of the helicopter's flag is Spanish law.  The helicopter was owned and operated by a

---

[15]Courts frequently refer to these as the "Lauritzen" factors, after the Supreme Court case in which
the bulk of the factors were first set out.  See Lauritzen v. Larsen, 345 U.S. 571, 582 (1953)

Spanish corporation and registered in Spain.[16]  Third, the domicile of all injured parties is Spain.  Fourth, the domicile of the helicopter's owner is Spain.  Fifth, the foreign forum, i.e., Spain, is not inaccessible to the plaintiffs.  As previously discussed, plaintiffs are Spanish citizens and defendants have agreed to submit to jurisdiction in the courts of Spain.  Sixth, the helicopter's base of operations is Spain.  Thus, the Lauritzen factors appear to indicate that, were this court to adjudicate the dispute, it would apply the law of Spain.  While not dispositive, the fact that foreign law likely applies weighs against retention of the action.  Ioannides v. Marika Mar. Corp., 928 F. Supp. 374, 379 (S.D.N.Y. 1996).

In sum, all of the public interest factors the court considered – (1) the administrative difficulties; (2) holding the trial in the view and reach of the citizens whom the trial might affect; (3) local interest in having localized controversies decided at home; and (4) applicable law – are either neutral or weigh in favor of resolving the dispute in Spain.  With this finding, the court has concluded its consideration of the third step of the forum non conveniens analysis, examining the private and public interests at stake in this litigation, see Iragorri v. United Techs. Corp., 274 F.3d 65 (2d Cir. 2001), and found that, for the reasons discussed in the previous sections, these private and public interests weigh decisively in favor of adjudicating the case in the courts of Spain.

---

[16]It bears noting that, in Lauritzen, the Supreme Court placed special emphasis on the law of the flag, noting that the law of the flag "must prevail unless some heavy counterweight appears."  Lauritzen v. Larsen, 345 U.S. 571, 586 (1953).  More recently, however, the Second Circuit has instructed that, "[g]enerally, we look to the law of the ship's flag [as the determinative factor] only if the shipowner is a party."  Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., 426 F.3d 580, 586 (2d Cir. 2005).  In the present case, while the helicopter's owner, Helicsa, is currently not a party, Vitalicio is.  As Helicsa's subrogee, Vitalicio stands in Helicsa's shoes and represents Helicsa's interests.  Further, it is clear that, but for this court's lack of personal jurisdiction over Helicsa, the defendants would have ensured that Helicsa was a party to this case.  In fact, the defendants' inability to join or implead Helicsa stands at the heart of its forum non conveniens and indispensable party arguments.

Thus, the court has now determined that: (1) plaintiffs' choice of forum deserves some deference, but not as much deference as if plaintiffs were citizens of the United States; (2) Spain is an adequate alternative forum; and (3) the private and public factors favor adjudicating this dispute in Spain.  As a result, after giving full consideration to the three-step process set out by the Second Circuit in Iragorri, the court finds that the balance is strongly in favor of the defendants.  See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).  The reduced deference given to the plaintiffs' choice of the District of Connecticut is not enough to outweigh the significant factors that favor the courts of Spain.  Thus, it is the court's opinion that litigation in the District of Connecticut is genuinely inconvenient, and that Spain is a significantly preferable forum.  See Iragorri, 274 F.3d at 74-75.  Accordingly, the defendants' Motions to Dismiss for forum non conveniens are granted.

B.     Rule 12(b)(7)

Rule 12(b)(7) of the Federal Rules of Civil Procedure allows a motion to dismiss for "failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b)(7).  The defendants argue that, under Rule 19, Helicsa is a necessary and indispensable party to the plaintiffs' suits.  However, because the court finds that Spain is the more convenient forum for these actions, the court need not consider the defendants' Rule 12(b)(7) argument.  Accordingly, the court takes no position on whether the plaintiffs' failure to join Helicsa warrants dismissal.

**V.     CONCLUSION**

For the reasons stated herein, the defendants' Motions to Dismiss (Doc. Nos. 14, 21, & 43) on the grounds of forum non conveniens are **GRANTED**, provided that: (1)

33

defendants consent to jurisdiction and to accept process in any suit plaintiffs file in

Spain on claims that arise out of the facts of the instant suit; (2) defendants waive any

statute of limitations defense(s) that may be available to them in Spain that arose on or

after the date of this lawsuit, so long as litigation is pursued in Spain in a reasonable

period of time; (3) defendants make available for discovery and for trial, at their own

expense, any documents, or witnesses, including retired employees, within their control

that are needed for a fair adjudication of the plaintiffs' claims; and (4) defendants will

not act to prevent plaintiffs from returning to this court if the Spanish courts decline to

accept jurisdiction of this action, if it is filed here within thirty days of the Spanish court's

ruling.

Judgment shall enter dismissing this action.  The Clerk is directed to close the

case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 18th day of March, 2009.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

34